We'll hear argument this morning in Case No. 17-1702, the Manhattan Community Access Corporation v. Halleck. Mr. DeLue? Mr. Chief Justice, and may it please the Court, careful adherence to this Court's state action cases is necessary in order to preserve the lines between government action and private conduct. The purpose of the test is to determine whether private action falls into the very rare exception of conduct that is fairly attributable to the state. Now, M&N is not a state actor under any of this Court's state action tests, and its conduct is therefore not fairly attributable to the state. M&N is a private nonprofit company. Its board is not controlled by the City of New York. The challenged conduct here was not compelled or coerced by the City of New York. There are no allegations that M&N acted jointly with the City of New York with regard to the challenged conduct, and M&N does not perform a function that has traditionally and exclusively been carried out by the City of New York. But M&N was engaged by the city to administer a scheme that was determined by state and city law, that is to afford access on a first-come, first-served basis, giving M&N no independent judgment about what will air or when it will air. So it seems that M&N is an administrator of a city-state policy, this first-come, first-served, and unlike other arrangements, it has no independent decision-making authority. Respectfully, Justice Ginsburg, that's not quite correct. The grant agreement under which M&N operates, it's a grant agreement between the cable operator, which was originally Time Warner and is now Charter. That agreement actually does grant us the ability to curate content. It also grants us the ability to create our own content. So the distinction that my friend has made about putting M&N on one side of the spectrum as a party that has no discretion and other community access organizations, on the other hand, that do exercise discretion is not correct. I'm sorry, it just means it's a mixed actor, meaning you can ‑‑ it has its own speech. Government often has its own speech, so that it can create speech I don't think means anything. Similarly, time, place regulations, that anybody can do that, or whether it's the government or a private actor with respect to property. So the question, I think, is, does it have discretion with respect to the content and its viewpoint neutrality on what the State is controlling, which is the placement rights on these cable lines? So the answer to that is that M&N does have discretion on the placement rights, which are not placement rights that the city has, but placement rights that through the grant agreement are directly to M&N. And M&N does have the power to ‑‑ Sotomayor, only because it's the agent directly of the State. The State has the relationship with Time Warner and tells them that Time Warner must deal with M&N. Well, that's not quite true, Justice Sotomayor. The agreement between Time Warner, the cable operator, and M&N is an independent agreement that is negotiated between those two parties. The city is not a party to that grant agreement. That grant agreement in turn gets approved by the Public Service Commission in New York. So the grant agreement gives us much broader rights to curate content, to decide to put shows together on one of our channels or a different channel. So the scheduling is not purely mechanical, not as if we take one videotape or CD from the street and put it in the machine and then put the next one in. Are these the facts that you've been talking about in terms of your ‑‑ did you curate the content? Are they disputed in the case? Yes. The case, as you point out, comes before us on the pleadings. Well, again, these issues were not on the pleadings. These issues were not raised on the pleadings. The grant agreement, which was introduced by Respondents, makes clear that we have that right to curate. But in Respondents' brief to the Court, they said that we did not have that right, that we were bound solely by the first come, first serve, and they made that sound as if it's purely mechanical, that strips us of any discretion whatsoever. That's so ‑‑ it is in dispute. Pardon me? Were you finished? Yes. Look, your brief, the PSC regulations require that content on public access channels be, quote, noncommercial, end quote, and that access must be, quote, on a first come, first serve, nondiscriminatory basis, end quote. So what is your discretion? So our discretion is based on ‑‑ that is what the regulation says. And that's what you say. So what is your discretion? And what the regulation says. In the grant agreement itself, the grant agreement gives us broader discretion than that. The grant agreement, which is between the cable operator and MNN, gives us the discretion to group channels, group shows together, put them on one particular channel, and that's, again, approved by the ‑‑ So putting shows on channel 14 rather than channel 16 wouldn't seem like relevant discretion, would it? I mean, what's broadcast out, whether it's 14 or 16, is absolutely determined by this rule. At least that's how I would read your brief to say it. That's true. We do not prescreen videos. They come into the door. We put them on the air. So we do that. All right. There's another question, then, that I have, which I can't get out of the brief. There are 13 directors, right? Correct. And two of them are chosen by the government. Correct. How are the other 13 chosen? The other 11 are chosen through, I believe, there's a nominating committee on the board that nominates people from media, from entertainment, from ‑‑ And who creates the nominating committee? The board. It's a subcommittee of the board. So then that's your ‑‑ it's a self‑perpetuating board. The other members are chosen by a nominating committee. The nominating committee is selected by the board. I think this would help you. And only two of the members are actually chosen by the government. They're not even chosen by the government. So are the 11 other members governmental people or have no governmental connection? They have no governmental connection. And even the two that are nominated by the board are not necessarily government related. Why didn't you put that in the brief? Nominate. Pardon me? Did you put that in your brief? I believe it's in there somewhere. But the dispositive issue was that the city of ‑‑ the borough president only has the ability to nominate two out of the 13. Mr. Tallulah, what would you think is the right result if you had the obligation that you think you don't have? In other words, just assume for the moment that you did have to follow a first come, first serve rule and that you didn't have the discretion that you think you have over programming. What would then the right answer be? The right answer, Justice Kagan, would be that the respondents or any other producers that have a complaint with us go to the public service commission, which has a specific cause of action that one can bring. Well, I guess I'm going back to Justice Ginsburg's question. On the assumption that you don't have discretion, that you have to follow a first come, first serve rule, I think that Justice Ginsburg asked, why doesn't that essentially make you ‑‑ you've been designated by the city to administer a public forum? Well, I think that it just ‑‑ it doesn't do that because there's a long line of cases from this Court that said that regulation of a private entity is not enough to bring it within the ambit of State action. So with regard to ‑‑ So you would say it's because you're private? We are private. Yeah. So, but I think the city thinks that it has a property right here. It has, you know, it's a property right that comes from a contract where the city has reserved for itself the ability to decide what programming should be. So the issue of whether there's a property right is certainly something that was not addressed below. It would certainly ‑‑ it would be a different type of property right than any one that I've seen. There's the ‑‑ there was a discussion in this Court's Denver area case about whether or not there was some kind of easement created in these public ‑‑ in the public ‑‑ in the cable system. And, you know, Justice Thomas in his partial concurrence argued that there was no easement available for something like this. Easement is a concept that's known in real property. Well, you can talk about it as an easement or you can just talk about it as a contract right, but these cable operators would not be able to function unless the government had given them these public rights of way. And in exchange for giving them these public rights of way, the government says, well, we're going to take certain stations and we're going to decide what the programming for those stations will be. And, you know, given that the whole thing doesn't get off the ground unless the government gives the cable operators the rights of way and that it exacts a quid pro quo for that, why isn't there, call it what you want, a property right coming from a government or whatever? Well, specifically, Justice Kagan, what the contracts don't do is that they don't give the city the right to choose what content is going to be on the public access channels. The city ‑‑ pardon me, the franchise agreement specifically gives the government the right to decide what's going to be on the government and education channels, which are different, and it says that those actually have to be overseen by a committee of the ‑‑ appointed by the city. The other side of that is the public access, which is a different concept. Public access, there is no requirement that the government operate it. In fact, the default under the State regulation is that the independent cable operator is going to be the party that operates the public access channel unless and until the municipality, in this case the City of New York, appoints a third party to do it. The other ‑‑ the franchise specifically says that the public access channels will be under the jurisdiction of the community access organization, MNN. So we have jurisdiction over those channels for purposes consistent with law and for other things that our board deems to be appropriate. Now, that is in contrast with the government and education channels, which are explicitly put under the jurisdiction of the mayor of the City of New York. The city can kick you out at any time, right? I don't know that that's true. There is no right in the franchise agreement that gives the city that right. There is nothing in the regulations that says the city can do that. Well, I don't know that it's the same principle in this context, but at least with respect to Federal appointees, usually the power to appoint carries with it the power to fire. And again, we don't know the answer to that. There is no express provision. My friend has said there is an express provision. I don't think that there is. Maybe there is an implied one. We have never had an issue where the city threatened to fire us or had any issue with us about the way that we administered the channels. So it hasn't come up. It's a latent, unexercised right. In our reply brief, we noted it would be like saying that a private road or a private drive was a public forum just because the government could take it by eminent domain. Well, maybe all this depends on whether there is some sort of recognized property interest involved. But maybe it doesn't. And if we step back and ask, who owns, in the colloquial sense at least, of the word, these channels? Is it the cable company or is it the government? What would your answer be? My answer would definitely be the cable company. How can that be? I mean, the cable company didn't decide that it wanted to dedicate these channels to this purpose and it doesn't control what's on these channels. It's the government that said you have to provide these channels and make them available on certain grounds. But the ownership right of the entire cable system, and I don't think this has been disputed, is the cable operator. So in this case, charter. Now, what's that? Pardon me? Physical goods. That's like the railroad zoning the railroad track. Correct. But for decades now, not for decades, for centuries, our cases have recognized that the railroad can own the tracks, it can own the switches, it can own the depots, but there's still a government access right to the use of the tracks. Right. So here, the government controls the content of what's on those cables. Respectfully, I disagree with that. The issue of control is a whole separate issue of the one of property that Justice Scalia raised. That's always the case with property. Sure. Property is a right, a property right is a right or privilege to use something to the exclusion of others or to the exclusion of the other owner. So, I mean, it's a simple definition of what a property right is. Right. But this is a situation where a private entity is controlling the channel. Did you want to complete your answer to Justice Alito? So, yes, I'm sorry. Justice Alito, to us, the issue is about control and who is controlling the public access channels. And in this case, it's clearly MNN is controlling it. It's under its jurisdiction according to the grant agreement. The city designated us to operate them 28 years ago and then hasn't said a word to us about it. Well, suppose the city appointed MNN to decide who would have access to a facility in Central Park. Okay. Would you say MNN is not then a state actor in exercising that authority? So, if I understand the hypothetical, so the idea is that MNN is taking on a role of managing parades or something in Central Park? Well, let's say there's a place where people can go and speak in Central Park or there is a facility where concerts are put on. Right. And the city enters into exactly the kind of agreement it has with MNN and says, you're in charge of this. Right. Are you then a state actor? I think it's a much closer call because of the public function test. If MNN was doing something that the city has traditionally and exclusively done, which is operate this speaking corner of the park, then I would think that that would be a much closer case and might well have the private operator as a state actor under the public function test. What is the difference between Justice Alito's hypothetical? Well, so the main difference is that the public function test has never been read broadly. It's always looked at the specific activity that the entity is involved in. Well, let's say that the city has decided we want a public theater. And so it creates a public theater. It decides it wants to use a first-come, first-served system. It decides it doesn't want to do the scheduling itself. So it hires somebody to administer the public theater under the rules that it should all be first-come, first-served. Would that administer be a state actor? So I guess the other, the one additional fact I'd want to know in the hypothetical is, is it city property? Is it a theater that is owned by the city? Right. So that could be one point of distinction is, is it property? And then we're back to the question that we started with. Right. But put that aside for a moment. Putting that aside, I would say that the answer is no. The key to look at when you're looking at a forum that is not one of the traditional, the street, sidewalk, or park, is to look at it and say, is this forum being operated by the government? And when you look at it and you say the private entity is there operating this forum, it's not the government. Well, the government says, we set the rules about how this is going to operate. We decided we wanted a theater. We decided we wanted first come, first serve. All we're asking you to do is, you know, we don't have an extra employee to administer this program, so we're contracting that function out. But what makes that person then the independent actor as opposed to the person who's essentially doing everything that the government would do, except that the government thinks it's more efficient to hire somebody else? Well, again, in this Court's decision in Jackson v. Metropolitan Edison, regulation like that, even pervasive regulation of a private entity does not convert that private entity. I can read the cases. What I can't do is figure out what the facts are. And so that's what I'm focusing on. It's now, do you have this power? At 5 p.m., something will be broadcast over your channel. Okay? Yes. Do you have the power to say, this evening we wish to discuss subways? Tomorrow at 4 o'clock, we will discuss the public schools. All right. Do you have that power? Or if we have one speaker who wants to talk about public schools and another one who wants to talk about whatever jumble they want so people can't figure out the issues because there are 40,000 issues in New York. And do we have a general conversation about all of them at once? Or do you have the power to order that? So we have the power to put on shows at specific times. I'm sorry. Shows. Look, first come, first served. Tell me if I'm wrong. In my mind, is there 40,000 issues, people can discuss them in any order, and anyone who wants to come up and broadcast can discuss any issue, and you have no power to change that. Or you do have the power to organize it and have first a subway discussion, then another discussion. Which is it? We have the power to organize it to some degree. To what degree? Well, so to the degree related to the grant in the grant agreement. No, that doesn't help me. Okay. You see, I have a simple factual question. Tomorrow I want to go and interrupt somebody who's in the subway discussion. As soon as he's finished, I want to discuss New York and hot dogs. Okay? Okay. Now, do you have to let me? Yes or no? Well, it would depend on who else has submitted tapes. Oh, somebody else has submitted a tape that they'd like to discuss schools. So I am third. That's a factual question. Right. What is it? Well, I mean, I think the answer is that your show will get on. Will it get on at exactly the time you want it to? No. But I will come third. Okay. Well, first come, first served. Is that right? Correct. So it has to be a jumble. Well, it doesn't have to be a jumble. Of course it might be coincidence that it isn't. But you have no power not to make it a jumble. No, that's not true. We do have power to have some ability to organize our channels. What? We can decide that shows that are appropriate for children will be shown in the morning and shows that are appropriate for adults will be shown at night. We can decide that we will cluster a series of shows about New York hot dogs. There happen to be five of them with different opinions. We'll put them on at the same in a row so that people can have a broad view of the merits. Does your argument depend on having editorial discretion? In other words, if you have no editorial discretion at all, do you still win under Jackson? Is that your theory? We still win under Jackson. We think that the lack of discretion does not convert us into a state actor. Under Jackson, under Sullivan, under all the cases that have looked at pervasive regulation, that has never been held to be enough to convert a private party's action into that of the State. In Rendell Baker, Blum, the entire series of cases that have looked at that issue and they've all held that regulation, even pervasive regulation, is not sufficient. But none of those cases involved the State or the government designating something a public forum. They've involved traditional public forums. That's a different issue. But we have three categories, traditional, designated, and private. And this is very different because this is the government designating this a public forum. Well, so the government makes a lot of decisions. The government, by act of Congress, created the U.S. Olympic Committee. The government creates a lot of entities. But not all of them are designated public forums. Many of them are limited. That's true, but to create But this one is very different. This one says first come, first serve, and your only discretion is against things that are not speech, obscenity, et cetera. Right. Well, I would push back on your assumption by saying that the government has created a designated public forum. That's already answering the question about State action. If the government is creating a forum and does not retain control over it, then it is not going to be a designated public forum of constitutional dimension. And we've tried to make that distinction in our briefs because something can be called a public forum and they're all over the place. But that does not convert it to being a public forum of constitutional dimension. So in your example, if the city creates a designated public forum, in order to get there, you have to have already determined that it is a designated public forum of constitutional dimension. And to have that, you need State action. So what's the difference? We go back to the questions my colleagues asked earlier. The city rents a theater, doesn't own it, but rents it or leases it or somehow takes possession of it through contract, designates it a public forum, says anyone can use the theater, first come, first serve. Although, and hires someone to administer that forum. So what's the difference? I don't understand. They have to clean it. They have to. The administrator has to get it cleaned, has to provide security, has to sort of organize the hours, et cetera. But nevertheless, the city says this, we rent the property, we have the power to tell you, keep it open, keep it free, keep it first come, first serve. Your only ability to restrict is time, place, and or obscenity and other illegal conduct. Well, it sounds like that situation would be different than ours because it sounds like it would be closing in on Burton versus Wilmington Parking Authority where there's a symbiotic or joint connection between what the city is doing and what the private entity is doing. Now, there's no allegations with regard to M&N that there's anything like that, no symbiotic relationship, no entwinement with the city at all. But why do you need that? Well, that's... If the city rents it, says this is how we're going to use it, this is the way it's going to be used, why do you need anything more? What greater control do you need? The greater control you need is you need the forum to be operated by a State actor, by someone that can be fairly said to be State. So now we have the State, this eluding responsibility by simply figuring out how to have adequate independence. Well, I don't think that that... In designating public functions, all it has to do is say we're just going to tip it over the line a little bit. Well, I don't think that that's a particular concern. Or keep away from the line a little bit. There are, first of all, I don't know of many designated public fora that are controlled by independent parties. Certainly the traditional public fora, I don't know of any either. So prisons are different. Prisons come along with the West v. Atkins case where you have a constitutional obligation and it's a traditional and exclusive role of government to operate the prisons. Mr. Chief Justice, I would like to reserve the rest of my time. Thank you, counsel. Thank you. Mr. Hughes. Thank you, Mr. Chief Justice, and may it please the Court. This is a public forum because New York has generally opened property that it controls for speech. New York has a general access policy. This is its first-come, first-served policy. And I think the critical feature here, which Petitioners cannot dispute, is that MNN lacks discretion, that they cannot decline to run content that is protected by the First Amendment. Well, I think they just did dispute it. I mean, getting to Justice Breyer's questions, can they lump things together? And can they say 5 o'clock is the show on hot dogs? And even if your show on the subway was submitted prior to one on hot dogs, the one on hot dogs is going to jump over it. So two things about that, Your Honor. First, as Justice Breyer was indicating, I think first-come, first-served probably means what it says, that there's an order to it. But second, even if there is a power to schedule and to group things, I don't think that has any bearing on whether or not this is a policy of general access because in all public forums, the government can impose neutral time, place, manner restrictions. Well, but it seems to me a significant departure from first-come, first-served in that they can – the programming, they're curating the programming. They're saying we're going to have a show about this subject and we're going to put people who want to talk about it on surely in order. Yes, the first hot dog show gets on before the third or fourth, but it doesn't – it's a significant departure from that. Well, let me use an example, Your Honor, that may help. In, for example, the Lamb's Chapel and Good News Club, the Court looks to the use of after-hours school classroom space and has found that that's a public forum to which the public forum rules attach. But I don't think there's any dispute that a school can say the Boy Scouts get to use that school property on Tuesdays and the Girl Scouts get to use that property on Wednesdays. The critical feature that makes it a public forum is that it's open to the public such that anybody who wants to speak their message has the ability to speak their message in that – I mean, my goodness, suppose that General Motors decides cars are controversial and they want to do something good for the city, so they open their offices somewhere, an auditorium, for everybody to speak. And they say it'll be first come, first served. I mean, that wouldn't make General Motors a public entity. No, of course not, Your Honor, because public forums are limited to those forums that the government itself chooses to hold. All right, now, what I have written down here, and I want to be sure I'm not missing something, these are the features that lead someone to say it's not governmental, or it is. One, the basic obligation is created by law. That's on your side. Yes, Your Honor. All right. Two, there are two appointed public directors, but there are 11 who are not and are members of the community. That seems to cut against you. Three, it's paid for. The cost is paid for by the private entity, but under government compulsion. Well, I don't know. I think that cuts for you. Four, that there isn't much discretion in respect to what they run, but there is some. They can decide subject matters as long as they give people a fair chance. And five, which is not part of that, but I'd love to hear what you have to say about it, is there is for you a state remedy. And moreover, the existence and nature of that state remedy is linked to the strength of your basic argument here. And so I am in a – I'm not taking a side or the other. I'm suggesting that I am genuinely uncertain about this, and I brought out the issues to try to get you to focus on. Yes, Your Honor. So let me take a few of these issues. To help clarify and to begin perhaps with the director's issue, our principal theory of state action is that MNN is performing the state function of administering a public forum. Our argument is not like, for example, the situation in LeBron where the court found that the private entity had become effectively dominated by the public, such that it was in all events a public actor for everything it did. That's not our argument. Our argument is that it is performing a public function insofar as it administers the public forum. It's like the example the court was discussing of a private theater that the government leases, then sets the speech rules on, and then it delegates administration. It does not matter if the entity to whom they delegate has a majority of the board of directors as appointed by the state or none of the board of directors appointed by the state. It's doing the function that is the critical point. Coming to Your Honor's last question about the state remedy, a few things to say about the existence of the Public Service Commission. The first thing is there has been no contention that there is some kind of exhaustion requirement or anything like that that would be a legal obstacle to Section 1983. Additionally, Petitioners or my client's Respondents did, in fact, go to the Public Service Commission. They received no remedy. That's described in a letter that was submitted to the district court, docket number 49 in the district court's docket. The Public Service Commission gave no remedy in this context. But I think it would be quite a dangerous policy if the court were to say that a state could avoid constitutional obligations by delegating them to a private actor insofar as it creates a state administrative remedy to handle the claims that would parallel constitutional rights. I think it's easy to imagine that states of all sorts could find that particular states have disfavored constitutional rights and determine that if they could hand or delegate their administration to private actors and then set up a state administrative scheme, I think this Court would find that that's not a way in which states or localities can obviate any of the constitutional protections from the First Amendment on. You've referred to public function, but under our cases, it has to be a traditional public function, something that's traditionally exclusively been a public function. How do you suggest that this qualifies under those precedents? So, Your Honor, I think what the exclusive public function test looks to is really two factors. First, is this the kind of function that requires a delegation of state sovereign authority? If it is, it's the kind of thing that exclusively states can do. If it's not, it's something exclusively states can't do. The second factor that pairs with that is, is this the kind of function that has expressed constitutional obligations attached to it? Those are the circumstances, for example, when the government exercises the eminent domain authority that the Court in Jackson said is an example of public function. It's only something the state or the state's delegate can do, and it has expressed constitutional obligations that attach to it. Administering a public forum is of the same character. It requires either the state doing it itself or the state delegating its sovereign authority to administer the public forum, and there are specific constitutional obligations that arise under the First Amendment that attach to that. Now, I think what Petitioner suggests is that you can get around that. I don't understand why leasing or operating a public access channel is akin to one of these traditional public functions that are described in the cases. Help me with that. Yes, Your Honor. And so what I think matters is can you look at the function and find those two criteria I just mentioned satisfied? I think there's the problem with Petitioner's argument that if you just relabel it in a way that doesn't meet those criteria, that would, I think, effectively undermine the public function test. If we look to West, for example, the Court found that there was a public function of treating inmates who are in state custody. Now, what was the actual function that was being performed? Well, it was a doctor who was providing orthopedic services. Why isn't this more like a utility in Jackson where, let's say, all editorial discretion has been taken away, and then you're operating, in essence, like a utility? And the Court there was very careful to say that wasn't, even though heavily regulated, that wasn't good enough. Both the two factors that I think are necessary for exclusive public function are missing in the utility context. There is no delegated state sovereign authority that's required to run utility. Private companies can and do run utilities, so running a utility does not require sovereign authority. And second, there's no constitutional protections that attach to the specific act of running a utility. That's unlike the context of administering the public forum, where administering the public forum does have to require the exclusive sovereign act and does have specific constitutional obligations. Kagan. Does your position depend on our finding a governmental property interest? And if so, what is the interest? Your Honor, I think our position is certainly strengthened by the fact that the government controls in all relevant respects. We do think that the Court needs to draw lines between where the government can designate a property as public forum and where it cannot. And one line that's been suggested by Justice Thomas's opinion in Denver area is a place, a property where the government can legitimately control as its own, and that can either be because it owns the property itself or because it has an exclusive legal interest in that property where it can set the rules of speech and legitimately treat it as its property that it controls. Roberts. Your idea that you can control, is that based solely on your power, which your friend called into question, to terminate the operator? So it's several things, Your Honor. Just to walk through how this, where the control comes from. First, it's the State and the City that decide even if public access exists. They create it then through negotiations with the cable companies. The cable companies would not even create this interest. Roberts. Okay. But jump ahead until we've got somebody in place. Well, once we have somebody in place, and many cities in New York run this themselves, they administer it themselves as a branch of State local government. And in those circumstances where they administer it under the State, exact same State regulatory regime themselves, I think there's little question in those contexts that it is controlled in all regions. And we'll jump ahead again to this case. Yes, Your Honor. And then in this case, they've taken the extra step, instead of controlling it themselves, of delegating it out to a third party. Here, however, the City has retained for itself exclusive authority to decide if they wish to terminate that administration. Right. And your argument is that that greater power necessarily includes all the lesser powers. Yes, Your Honor. So because you have the power to terminate, you have the power to select programming? Your Honor, much of the City has the, they've delegated that power to select programming in the short term. But again, there's really no power to select programming because anybody's program who wants to be, who wants to run it. But you've already established that there's some wiggle room, at least in that, since you can have the hot dog program and you can have the subway program regardless of whether the subway people wanted their shows before the hot dogs. But the critical thing is if the hot dog program wants to come on, there's nothing MNN can do to say you cannot access this forum. It's the same way of going to Central Park. If you're, you know, the hot dog speaker and you want to go to Central Park and speak that message, you have the right to do so because it's a policy of general access. But your brief puts a lot of weight on the fact that this has to be first come, first serve. But suppose it wasn't. Suppose MNN had discretion to decide which programs to accept. What would the result be then? If it has discretion so it can exercise editorial control, then it would not be a public forum. Editorial control. So here's, if I think back, maybe you can help me with this, looking at it in a different way. Let's say that MNN is interested in a multiplicity of ideas. A multiplicity. That's the marketplace idea. Now, I don't know which way to go. I'm sure one thing that would help in this direction is having some channels such as first come, first serve. But I also think people might turn those off. And another way to do it is to allow a lot of different Internet owners or Internet providers or et cetera, et cetera, to choose a lot of different ways. And they will have different views. Maybe there should be a mix of ways of bringing different views to the public. And I'm frightened in deciding for you that it would be too rigid. And before you know it, everybody, where there's something that looks like a public forum, run by private companies, would have the kind of access that you may well have here. So have you ever thought about that? Yes, Your Honor. Let me address that directly. Because in our view, the states and localities have complete control as to decide whether they want to have a system that New York has that leads to these first consequences or if they prefer to have a system, for example, as California has. California has no first come, first serve requirement. And when you look how the Los Angeles public access station is organized, there is no right if you're the hot dog person and you want to put your video on, you have to get through a board that exercises control. Well, this comes back to what I wanted to follow up with on the question that I asked before. It seems strange to me to say that if the policy is first come, first serve, no editorial discretion, therefore no viewpoint discrimination, the First Amendment applies. But if there's discretion and the administrator has the authority to engage in viewpoint discrimination, the First Amendment doesn't apply. It seems exactly backwards. Well, Your Honor, I think it just depends if the state locality has chosen to create a public forum. It has its discretion as to whether or not it wishes to create a public forum in a place. For example, going to the theater circumstance. When the government leases a theater, it has a choice to make. It can organize the speech rules in that theater to make it a public forum where anybody who wants to speak their message has the right to do so. Or it can organize that theater and say we, the government, are going to decide who gets to speak. If the government is running something and it allows people to speak, it seems to me there are two possibilities. One, it's throwing this open for anybody to speak. But if it's not doing that, then what happens there is government speech. Now, would you – is this government speech? No, Your Honor. I think what's happening here is they've thrown it open. If – all right. In the situation where there's discretion, would you say that it's government speech? Well, I think – So you don't – you just – they empower the administrator to decide who's going to talk. And the administrator chooses the viewpoints that it likes. That's government speech? If – so that would be a private forum, Your Honor, and if it's being administered by the state, then that would be government speech. Yes, Your Honor. But we don't suggest that constitutional obligation is attached in that context because there's no function of administering a public forum in that context. So if there's a delegation to a private entity, a different result would control, which is why, to answer Justice Breyer's question, if the state chooses to configure its public access channels in that way, it would lead to a different result. And our principle is simply the modest one of states and localities should choose how they get to configure their channels. It's not so modest. It seems to me what would make sense here is that you have to go to the state. You're claiming that you come here because there is the very obligation that you want imposed by state law and the state. And that's the reason you're up here. But I don't know of any doctrine – this is in your side – I mean, I don't know of any doctrine that says that you have to go to the state. And therefore, we're not – I had Justice Alito's problem. I think that was his problem. You're right if and only if you have an excellent state cause of action. But, Your Honor, and to take the example of Good News Club and Lambs Chapel school access cases and Christian Legal Society and all those cases, those are cases that turn on underlying state determinations. The Court was clear in Good News Club that the school district did not have to create a policy of general access. That was a state decision or a school district decision. But once that local government made that decision, it had a policy of constitutional consequence. So although there was certainly, I'm sure, a way to go to the school district and complain about the fact that they were discriminating against unpopular religious organizations, they also had a First Amendment claim, which this Court heard and vindicated. So – Sotomayor, so can you explain the flip of what I think may be troubling – I may be wrong – Justice Breyer is – and Justice Alito, if this is the administrator for the state, I know you sued the state, the city here, but you then dismissed your case against it. Right. Could you have just sued the city and not MNN? There was a claim initially brought against the city that was dismissed for failing to show the city directly caused this under Monell. We certainly don't challenge that argument. I don't believe there is a claim against the city in this circumstance. So you think the city would be protected by Monell theories? I think that's right, Your Honor, because the actor who's choosing to engage in the activity that's engaging in viewpoint discrimination is MNN in this context, but they are – It's agent. It's administrator as agent. That's correct, Your Honor. Yes, Your Honor. So it would be like the police officer who uses excessive force. Correct, Your Honor. Yes, Your Honor. Where's the line that you think – I mean, what you said essentially is the administrator has no discretion, but suppose the city gave the administrator some discretion. Where's the appropriate line? I mean, suppose the city – suppose it weren't a complete public forum. Suppose there were subject matter limitations. Suppose that the city gave the administrator some discretion to decide within particular areas which programs were better than other programs. Where's the line that this starts becoming not a public forum in your view? So this just turns on the courts a limited and unlimited public forum cases. And the underlying question is, is it a policy of general access or selective access? Now, general access in what the court calls limited public forums, the government can put some sort of fence around what is the permissible speakers or permissible message. For example, in the Rosenberger context, the public forum was a student activity fund, but it was limited to student organizations whose majority of members were UVA students. So that was a limitation. But within that limitation, it was general access. Anybody could seek to use that forum. If, however, within that limitation, there is still additional discretion, then it becomes a form of selective access. For example, like the debate circumstance in Arkansas Educational. Because there was still – even if you qualified within the rules that the government established, there was still additional discretion on top. The critical question is whether or not there is that additional discretion that's been reserved to the State. And if there is that additional discretion, then it becomes a form of selective access rather than general access. And this Court has held that does not qualify as a public forum in the constitutional sense. Breyer. Go back to Justice Sotomayor for a question. You said you didn't have a suit against the City. But what about a suit or some kind of administrative proceeding against – is it M&N or whatever you call it? How do you – M&M? M&M. M&M. Did you have an action against them, either administratively, beyond the ground that they're not administering the first-come, first-served policy, or in a State court? So, Your Honor, what Petitioner suggests is that we turn to the Public Service Commission. And at the docket 49 of the district court, we explain that our clients did turn to the Public Service Commission, and they were afforded no remedy. The Public Service Commission, as I understand it, has told them that this was not the kind of claim that they would hear. Now, this is not in the record. But could you get court review of that under New York law? Sorry, Your Honor? Can you get court review of that adverse decision by the Public Service Commission? I'm not aware of any private cause of action in that context, Your Honor. But it does go to the broader question of if there is a First Amendment claim. I think this is parallel to the school access cases and others. The Court has never said even if a State creates a parallel cause of action, that that somehow displaces the core constitution. But I want to know what you think on this, because it could be that this rule, first-come, first-served, is just hortatory, if there's no remedy for it. Well, Your Honor, I think it's the same. For a violation of it. You're saying they violated it. All right. What's your remedy? And if there's no remedy, what kind of a rule is it? Well, a few things to say about that, Your Honor. First, Petitioners point to the Public Service Commission case of Amano, which they suggest shows that they have discretion. But when you read Amano, which is the regulator here, it says the reason that Brooklyn's access stations were permissible is because they had channels that were operated on a first-come, first-served basis, and that the Petitioners in Amano had not pointed to any content that anybody had asked that channel to run that was not actually put over the airwaves. So that was the rule that was direct established by the Public Service Commission. But beyond that, the regulation, the State law is plain on its face. It's an obligation of State law, and it's also built into the contracts. So I think the law, the directive of the State is quite clear. The City and the State had the ability to choose the rules of speech for that particular forum. They have chosen those expressly with first-come, first-served. Petitioners, again, have not, I don't think, can deny the straightforward premise that if somebody wants to bring the hot dog speech or any of that kind of speech, that they must run that speech. They cannot decline to do so. I'm your client. Do I have a remedy in State court or not? What are the odds? I'm not aware of any remedy that you would have in State court, Your Honor. I don't know that there is any administrative-style remedy against the Public Service Commission. You've referred a few times to the school access cases. Of course, those were government property, right? That's right, Your Honor. So here, just to make sure I'm following, MNN is a private company, correct? Yes, Your Honor. And operating a channel on a cable system that's also privately owned? Yes, Your Honor. And it's heavily regulated by the State, right? So it's not government property. It's not operating on government property. It's just heavily regulated in terms of being forced how it performs its functions, which, again, coming back to the utility and everything we said in Jackson on that front, but I just don't think the school access cases help you because they assume the conclusion. It's government property there. No one disputes it. Well, two things. Just about the school access cases, I agree that this case presents the question of if in the school district and Good News Club interpose a nonprofit, if the But to come back to the second point about the property interest, I think there are two separate property interests that are issues with what the Court identified in Turner. There's no doubt that the cable operator has a property interest in their physical cable system over which this is all distributed, and they certainly have rights to that, including First Amendment rights. Those are claims that would have to be brought by the cable operator or arguments that would be advanced by the cable operator. My point is simply it's a private company operating a channel on another private company's system, and it's forced in terms of how it exercises its discretion to do so in a particular way by the government. But that just means it's heavily regulated in terms of its editorial discretion. You're melding, I think, the public forum question with the state action question. I think the utility, though, that Your Honor is referencing is akin to the cable operator, and so that might be an argument that would be relevant to the cable operator. I think the question, Mr. Hughes, is what property interest does the government have? Yes. And so to get to that, Your Honor, thank you. The property interest that is quite distinct here is the interest in the channel. It's the interest that the government has obtained to be able to place specific content on particular channels that the city. And it obtained that interest when it gave the rights of way to the cable operator? Is that right? Yes, Your Honor. What it took back or what it reserved for itself was a property interest in these public access channels? Yes, Your Honor. In the franchise agreement, part of the quid pro quo agreement where the city gives the cable operator the access to the public rights of way, which is critical to them constructing their system, in exchange the city obtained the rights to have control over a select number of channels. And so that is the particular right that's at issue. So what you're saying is this is not just a lot of regulation. This is a property interest that the city reserved for itself when it gave over the rights of way that the cable company needs to do anything. Absolutely, Your Honor. Tell me, what is the interest that it reserved for itself? The interest it's reserved for itself is to control a select number of channels and to place the content that it wishes over those channels. In many cities in New York, like Buffalo and Scarsdale and others, the cities have retained that property interest and operate, administer that property interest themselves. The question in this case is when they delegate that administrative right. Where does it say that they retain the interest over the content on the channel? Sorry, on when the administration of the delegation occurs, Your Honor? Yeah, I thought that's where you were telling me they reserved that property right. And I just wonder, where is there anything that says that extends to what appears on the channel? Well, so, Your Honor, what has happened in this context is the city has set the speech rules, which includes the first come, first serve, which we believe is critical. Okay, I believe it may be critical as well. And as far as I can tell, there seems to be a significant factual dispute over what first come, first serve actually means. You agree it doesn't actually mean first come, first serve. I mean, if they've got a program on the subways and somebody says my, you know, my show about something else was submitted first, well, too bad. You can show that tomorrow. So first come, first serve sounds good, but it doesn't mean what it says. What it means is it's general access, Your Honor. That's what's critical, is it means that it's general access. And let me say, though, take the public park example. Where if the city delegates authority of public park and they say the rules, the speech rules here is this is general access. You can't engage in viewpoint discrimination. And we're going to delegate all administrative function. That the court would not look to see whether or not they've reserved for themselves the ability to override particular one-off decisions. The point is they've delegated the function of controlling access to a public forum. So whenever it says in your brief, whenever it says first come, first serve, I should substitute the words general access. That's what is the relevance of first come, first serve. So if the government opposes a first come, first serve requirement on a private company. So I think that's a very different. What happens then? Because that's some of the hypotheticals, as you know, raised in the amici briefs about Twitter and YouTube and the likes. Absolutely, Your Honor. So of course there has to be a balance between the sovereign's authority to designate nontraditional forums and private property. There are two ways the court can approach that. The one way is. But I thought you said to the Chief Justice that the reservation of first come, first serve is what gave you the property interest. I think, though, Your Honor, there is a limitation on the government's authority to impose that kind of speech rule on property that does not control. This is property that does control. But what gave you the property interest if it's something other than the first come, first serve? What gives you the property interest is that you've given over the rights of way and you've kept access to, you've kept the rights to determine how to use public access channels. And you can do that yourself or you can use an administrator. Is that correct? Yes, Your Honor. It's the franchise agreement that gives that property right that you can control. Yes, Your Honor. And so this is distinct from the private property where one attempts to impose a first come, first serve requirement on private property, which is a completely different case. And I think it would be a different case. So if a utility gets rights of way from the local government, does that give the local government the, does that make the utility a state actor? I don't think it makes the utility a state actor in that context because there's no performance of the public function that requires, again, delegated sovereign authority in exercise of something that's carefully tied to a constitutional obligation. That's just not happening in the utility context. The language, I'm repeating myself, but the language we've used in the cases is traditionally exclusively a public function. And I'm not sure, it's not even true in this case, right? In other states, other localities, these public access channels are not run by But, Your Honor, that's again why I don't think one can define this away by coming up, by plucking out some activity that's not traditional. It's what is the authority that's necessary to do what the state is doing, or to what the private actor is doing. The authority that's absolutely necessary is the authority to administer the public forum that has to come from the state and has constitutional obligations that stack up behind that. And that's, so again, as I said earlier, if one were to look to West, you could redefine the functions providing orthopedic services, and of course that's something that wouldn't meet the test standing alone. What matters is did the doctor performing those services in the context of that particular case have to exercise delegated sovereign authority? And the answer there is yes. You agree, if you prevail here, you agree that it would be different if it were a private company, we all agree it's a private company that operates an open forum, Justice Breyer's General Motors example. Absolutely. The government can't require first come first served on that. Absolutely, Your Honor, and that's either because there's a blanket rule saying you cannot impose a public forum on property the government cannot control, or one would look to Justice Rehnquist's opinion in Pruneyard where Justice Rehnquist has been compelling speech problems. I think those two results probably, those two approaches probably come to the same result. But I agree with Your Honor, that would be a different case and would not be permitted. Breyer. But it's not so clearly different because in the United States there are vast numbers of different kinds of arrangements between government and private people ranging from agency to General Motors. And of course if you say public park, if that's what it is, you win in my opinion. Okay. But it's not. Is it Southern Pacific Railroad, which was regulated for many years? And what am I getting into? You see, that's such a general question. And I don't know if you have a thought on that. Just very briefly, Your Honor, our argument is limited to the context of public forums and the administration of public forums being state action. And our argument goes no further than that. Thank you. Thank you, Counsel. Four minutes. Mr. Daly. Thank you. So just to hit a couple of points, Respondent's view of the public function test would be a radical expansion of what this Court has held before to be the public function test. And I think a good way of looking at it is that they're asking this Court to find a public function as the operation of a public forum when the very specific thing that we do, which is the operation of a public access channel, is something that the City of New York has never done. And it certainly, going back to Denver area, has never been a traditional and exclusive function of government. One question about the PSC, we never received a complaint from the PSC that the Respondents had brought any claim against us. There is a remedy if the PSC, if you believe that the PSC is not operating correctly. It's called Article 78 in New York. And you can bring such a claim if you believe that the Public Service Commission is not operating. This is not a delegation of a constitutional obligation as in West and Atkins. This is not a — in West, there is an Eighth Amendment obligation for the State to perform, to provide medical care for its prisoners. There is nothing like that here. The PSC regulations put the obligations on the cable company, not on the City. So this is like Jackson and it's like Sullivan, because those — the party that is obligated to provide public access channels is the cable operator. And in the first instance, it's got to operate them unless and until the City decides to delegate a third party, which is not an agent of the City, but a third party. Again, the — Sotomayor, but the City retained the right in the Franchise Agreement to dedicate this to the public use, to designate this a public forum. Well, the Franchise Agreement does not dedicate this as a public forum. It says that these channels shall exist. It does not say that this is going to be a constitutional public forum. And it could have done that by delegating it to a government entity, as my friend says happens in other places in New York. It didn't do that. It could have done that by dominating the board of MNN. It didn't do that. It could have done it by requiring that MNN's policies be reviewed by the City. It didn't do that. None of those things are present here. This is a company that was delegated — that was designated to operate these channels 28 years ago, and the City hasn't come and said anything to us about how we operate it. They've left us alone. We're a private company, and we are not — we are not a State actor under any of this Court's tests. Just quickly, the Good News Club and all of the school access cases, those not only involved government property, but the defendants in those cases were government actors. Clear as day they were government actors. And it was, in fact, you know, so when you're looking at the — the who is responsible for the challenged conduct, it's very clear that it was the government. Here, that is not the case. Here, in order to find that there — that the challenged conduct was caused by the government, you first have to find out that we are a State actor under one of this Court's tests. We're asking this Court to apply its State action tests the way it always has, and the Respondents are asking for this Court to apply them in a radically new way. Thank you very much. Thank you, Counsel. The case is submitted.